UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY LYNN ARTHUR,

               Plaintiff,                                  Hon. Sally J. Berens

v.                                                Case No. 1:19-cv-484

MICHIGAN STATE UNIVERSITY and
MICHIGAN STATE UNIVERSITY
BOARD OF TRUSTEES,

               Defendants.

_____/

**OPINION**

Plaintiff Kimberly Arthur filed this action against her employer, Michigan State University, and the Michigan State University Board of Trustees (collectively MSU), alleging claims of gender and age discrimination and retaliation under both federal and state law. Arthur's sole remaining claim in this action is retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*

Now before the Court are MSU's Motion for Summary Judgment and Arthur's Motion for Partial Summary Judgment.[1] (ECF Nos. 92 and 94.) For the following reasons, the Court will **grant** MSU's motion, **deny** Arthur's motion, and **dismiss** Arthur's Third Amended Complaint with prejudice.[2]

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the Court conduct all further proceedings in this case, including entry of judgment.

[2] Although Arthur has requested oral argument, the Court finds that oral argument is unnecessary as the parties' briefs adequately develop the issues in contention.

## I.   Background

### A.   MSU's Infrastructure, Planning, and Facilities Unit

MSU, one of Michigan's largest public universities, conducts its operations through various business units. (ECF No. 95-2 at PageID.637.) The Infrastructure, Planning, and Facilities unit (IPF), which is responsible for planning, building, and maintaining MSU's buildings, roads, power plants, utilities, and other property on the main campus and the buildings and property on auxiliary campuses, is one of the largest business units. (*Id.* at PageID.637–38.) In 2018, IPF had approximately 700 full-time employees and 600 on-call, temporary, or student employees. Most of these employees are tradespeople and operators, rather than office staff. IPF's employees belong to six of the ten unions that are active at MSU. (*Id.* at PageID.638.)

During the relevant period in this case, IPF was divided into five main divisions: (1) Building Services; (2) Campus Services; (3) Planning, Design, and Construction; (4) Support Services; and (5) Utilities. (*Id.* at PageID.638, 644.) Each of these divisions also had its own independent areas. For example, Custodial Services, Landscape Services, Surplus Store & Recycling, and Transportation Services were separate areas within the Campus Services division. (*Id.* at PageID.644.) Support Services provided financial administration, such as budget forecasting, accounting, and monitoring of financial controls, to the other IPF divisions. (*Id.* at PageID.638; ECF No. 95-4.)

IPF also maintained its own central Human Resources Department (IPFHR) which, along with MSU's central HR department and its Employee Relations Department (MSU's union liaison), assisted the leaders of each division with personnel issues. (*Id.* at PageID.638.) MSU union employees' job titles are linked to their classifications. In general, when an employee's job duties have increased beyond those of his or her current classification for a period of six months or more, the employee can be reclassified to a higher level. Reclassification requests in IPF are

2

typically initiated when a supervisor submits a request to IPFHR to reclassify a direct report. Michelle Jacobs, a Human Resources Administrator II in IPFHR, was primarily responsible for reviewing reclassification requests. In handling these requests, Jacobs provided an analysis and forwarded her recommendations back to IPFHR for final approval. The request was then forwarded to MSU's central HR department, which typically reviewed and implemented the recommendation. (*Id.* at PageID.637, 639.) The analysis entails considering the employee's specific job duties and functions, comparing them to the specific classification level criteria, and ensuring that the levels are being applied consistently within the relevant business unit. (*Id.* at PageID.639–40; ECF No. 95-5.)

### B.      Arthur's Position and Duties at MSU

Arthur's employment with MSU began in approximately 1998. (ECF No. 95-9 at PageID.692.) In 2009, she became employed at IPF in the Landscape Services (LS) unit of the Campus Services division as an Administrative Assistant II. (ECF No. 103-8 at PageID.873.) LS is organized into various operations crews ranging in size from two to 25 employees, each led by a supervisor. (ECF No. 95-1 at PageID.629–30.) Arthur worked in the LS office as its manager and was a member of the Administrative Professional Supervisors Association (APSA). Her position held a level 11 classification. (ECF No. 95-2 at PageID.639.) Arthur and the LS crew supervisors reported directly to the manager of LS. In 2018, LS had 64 full-time employees and 111 on-call, temporary, or student employees. (*Id.*)

As of 2018, Arthur's primary job duties included staffing the LS office and supervising its employees, assisting LS supervisors in processing paperwork associated with part-time employee turnover on the various crews, and overseeing financial transactions. (ECF No. 95-1 at PageID.630; ECF No. 95-9 at PageID.690; ECF No. 95-17 at PageID.756–58, 763–64.) Arthur also served as an informal HR resource to LS supervisors, but she was not authorized to make HR

3

decisions, except those relating to her direct reports. (ECF No. 95-1 at PageID.630; ECF No. 95-17 at PageID.748–49, 796–97.) At the beginning of the year, in addition to Arthur, the LS office staff included a full-time secretary and several student employees, all of whom reported to Arthur. (ECF No. 95-1 at PageID.630; ECF No. 95-9 at PageID.690.) Arthur was not involved in planning or reconciliating the LS budget. Her involvement in financial matters was limited to ensuring that purchase requests were properly documented and authorized by the appropriate individual, usually the manager. (ECF No. 95-4 at PageID.656; ECF No. 95-17 at PageID.756–58, 769.)

### C.     Matthew Bailey Is Appointed LS Manager

In January 2018, Matthew Bailey became the LS Manager. At the time, Bailey and Arthur had worked together in LS for several years. After Bailey became Manager, he made two organizational changes within LS, both of which increased Arthur's duties and responsibilities. First, he assigned Arthur and her staff responsibility for all LS hiring, most of which had been done by LS supervisors. Consequently, Arthur and her staff became responsible for all hiring aspects, including preparation of job descriptions, posting and advertising of open positions, participating in most of the hiring committees, and overseeing the onboarding and offboarding of all LS employees. (ECF No. 95-11 at PageID.630–31; ECF No. 95 at PageID.763–64.) To facilitate this aspect of the reorganization, Bailey authorized the reclassification of Arthur's existing full-time direct report so that Arthur could delegate additional responsibilities to her. Bailey also authorized Arthur to hire a second direct report at the same, increased classification. (ECF No. 95-1 at PageID.631; ECF No. 95-17 at PageID.746–47, 754, 764.) Second, Bailey gave more budget oversight responsibility to all LS supervisors, including Arthur. (ECF No. 95-1 at PageID.631; ECF No. 95-4 at PageID.656; ECF No. 95-17 at PageID.759–61.) Historically, the LS manager was responsible for the entire budget with the assistance of Support Services. (ECF No. 95-1 at PageID.631; ECF No. 95-17 at PageID.759–61.) With this change, the supervisors

became responsible for managing their own respective portions of the budget. Thus, Arthur received budgeting and oversight responsibility for the portion of the LS budget relating to the office staff and operations. (ECF No. 95-1 at PageID.631; ECF No. 95-17 at PageID.760–61.)

In addition to these organizational changes, Bailey implemented a title change suggested by Kelly Pung, an accountant in Support Services. Pung had learned that many of the business leaders within IPF had designated someone other than themselves as the "Fiscal Officer"—the individual with ultimate authority for the unit's account. She determined that the best practice was for the business leader of each area holding decision-making authority over the budget to hold the title. (ECF No. 95-4 at PageID.654–55.) Although MSU policy allows for designation of a "Fiscal Officer Delegate," with "push-button" authority to approve transactions in MSU's electronic accounting software, many of the business leaders in IPF had assigned the "Fiscal Officer" title to subordinates who approved financial transactions, rather than retaining the title as the individual ultimately responsible for the accounts. During 2018, Pung worked with at least seven divisions and areas within IPF, including LS, to realign the Fiscal Officer title with the business leaders in those areas. (*Id.* at PageID.655.) Pung first spoke to Bailey about redesignating the LS Fiscal Officer title from Arthur to himself in the first half of 2018. Bailey spoke with Arthur about the change in June but did not implement it—reassigning the Fiscal Officer title to himself and designating Arthur as the Fiscal Officer Delegate—until late August 2018. (ECF No. 95-1 at PageID.632; ECF No. 103-9 at PageID.889–90; ECF No. 103-21.) In connection with the change, Pung advised Arthur that her daily activities would continue as normal, but that Bailey would be fiscally responsible for the LS accounts. (*Id.* at PageID.1088.)

### D.    **Arthur Requests Reclassification**

In June 2018, Arthur asked Bailey to support her request for reclassification from her existing level 11 "Administrative Assistant" position. (ECF No. 45 at PageID.200.) Although

Arthur had never been reclassified since joining LS in 2009, she believed that the promotion of her direct report as part of the office reorganization made it more likely that a reclassification would be granted. (ECF No. 95-17 at PageID.779.) The "Administrative Assistant" classification series was being retired and replaced with a new series titled "Administrative Business Professional," which Arthur believed was a more appropriate title for her job and the functions she performed. (*Id.* at PageID.779–83.) Arthur and Bailey discussed both the level 12 Administrative Business Professional designation briefly but focused mainly on the level 13 Senior Business Professional designation because that was the level Arthur felt most accurately reflected her job duties, and she was not interested in the level 12 classification. (*Id.* at PageID.783–84.) Bailey indicated that he was very supportive of a reclassification and asked Arthur to compile information and some bullet points for the request and submit it to him, which she did a few days later. (ECF No. 95-1 at PageID.633; ECF No. 95-17 at PageID.783; ECF No. 103-14.) Bailey looked at the materials but took no action over the next few months to submit the reclassification request. (ECF No. 103-12 at PageID.1023.) When Arthur followed up with Bailey regarding the status of the request in July or August, he led Arthur to believe that he had submitted the request to IPFHR. (ECF No. 95-1 at PageID.633; ECF No. 103-22.)

On July 10, 2018, Arthur told Bailey during a meeting that she believed prior managers had discriminated against her. (ECF No. 95-1 at PageID.632; ECF No. 95-17 at PageID.785.) Although she had not filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) at that point (and did not mention an EEOC charge in the meeting), she told

Bailey that she had requested an "investigation."[3] (*Id.* at PageID.786.) Bailey was empathetic and said that he understood Arthur's concern. (*Id.* at PageID.785.)

In August 2018, two male supervisors asked Bailey to submit reclassification requests for them. Due to the amount of work and time involved in preparing a reclassification request, Bailey contacted Jacobs in IPFHR to determine whether he could seek merit raises, which had to be requested by August 15, rather than reclassifications for the employees. Bailey did not include Arthur in his inquiry because she had indicated that the change in title was important to her. Jacobs told him that, because those employees had increased the number of direct reports, reclassifications, rather than merit pay, would be more appropriate. Bailey submitted the reclassification requests for both supervisors in October 2018. (ECF No. 95-1 at PageID.633–34; ECF No. 95-2 at PageID.641; ECF No. 103-18.)

In several emails sent in early September 2018, Arthur raised concerns with Bailey about the timing of the change of the Fiscal Officer designation and its effect on the reclassification request (which she believed Bailey had submitted), as well as the status of the reclassification. (ECF No. 103-22.) Bailey met with Arthur on September 7 to discuss these issues and admitted that he had not yet submitted the reclassification request but told her that he still intended to do so. He also admitted that he had not been truthful with her about the status of the reclassification request. (ECF No. 103-12 at PageID.1026.) Bailey became upset and walked out of the meeting after interpreting one of Arthur's comments as indicating that she intended to add him to a pending investigation. (*Id.* at PageID.1026–27.)

---

[3] Bailey denies that Arthur told him during the meeting that she had requested, or intended to request, an investigation. (ECF No. 103-12 at PageID.1024.)

Several days after the September 7 meeting, Bailey learned from an accountant in Support Services and a LS supervisor that Arthur had requested reimbursement for a cake she had made through her cake business for a colleague's retirement party. (ECF No. 95-1 at PageID.634–35; ECF No.95-15.) Although Bailey was aware that Arthur made the cake for the retirement party, he was not aware she was seeking payment for it as she had not sought his approval. (ECF No. 95-1 at PageID.635; ECF No. 103-11 at PageID.1016.) After speaking with Jennifer McManus, IPFHR's Manager, Bailey spoke with Arthur about the payment at their next regularly scheduled meeting and cautioned her that she should seek supervisory approval before seeking payments to herself. (ECF No. 95-1 at PageID.635.)

### E.     Arthur Submits a Reclassification Request through her Union

On September 18, 2018, Arthur submitted a request through her union, APSA, for reclassification to a level 13 Senior Administrative Business Professional. (ECF No. 95-9 at PageID.689.) Arthur justified her request, in large part, based on the increased duties that Bailey had assigned her as part of the LS office staff reorganization. (ECF No. 95-5 at PageID.662; ECF No. 95-5 at PageID.690.) Because the union submitted the request to Employee Relations, it went directly to MSU central HR and was referred to Charles Folino for review. (ECF No. 95-5 at PageID.659.)

Per his standard practice, Folino determined a range of appropriate classification levels for Arthur, being either a 12 or a 13, with the final determination dependant on how the levels were applied within IPF. (*Id.* at PageID.660, 664.) In conducting his evaluation, Folino met with Arthur on October 1, spoke with Bailey by phone on November 30, and spoke with Jacobs and McManus on December 6. (*Id.* at PageID.662–64; ECF No. 103-28 at PageID.1139.) Bailey told Folino that he agreed with the recommendation to reclassify Arthur to a level 12 and indicated that he would provide additional documentation. (ECF No. 103-31.)

8

Folino also asked IPFHR to provide a recommendation regarding the appropriate classification level. Jacobs handled this request for IPFHR by comparing Arthur's job duties with similar positions in IPF. At that time, IPF had only two employees with similar office administration duties that were classified higher than level 11: Kelly Feister, at a level 12, and Jannene Andrews (with whom Arthur sought to compare herself), at a level 13. (ECF No. 95-2 at PageID.640.) Jacobs determined that Feister, an office manager in the Building Services division, was the more appropriate comparator as her day-to-day duties, consisting primarily of HR administration and financial oversight, were more like Arthur's duties. Even so, Feister's duties were larger in scope, as they covered an entire division with 252 full-time employees and 64 on-call, temporary, and student employees, compared to LS's 64 full-time and 111 on-call, temporary, and student employees. In addition, Feister had seven direct reports, while Arthur had two. (*Id.* at PageID.640–41.) On the other hand, Andrews held a division-level position in Planning, Design, and Construction, in which she had five direct reports and was responsible for planning and reconciliating the division's entire $9.6 million operating budget. Andrews also participated in managing and overseeing the division's $408.6 million capital projects budget. (*Id.* at PageID.640; ECF No. 95-4 at PageID.656.) In contrast, at the time, Arthur had not planned or reconciled any MSU budget, although she now plans and reconciles the LS office budget of $140,000. (ECF No. 95-2 at PageID.640; ECF No. 95-4 at PageID.656; ECF No. 95-10.) Thus, Jacobs advised Folino that Arthur's position did not merit a level 13 reclassification and that reclassification to level 12 was a "close call." (ECF No. 95-2 at PageID.95-5 at PageID.664.) Ultimately, based on this information, Folino recommended that Arthur's position be reclassified to a level 12, effective as of December 1, 2018. (ECF No. 95-2 at PageID.641; ECF No. 103-28.)

### F.      Arthur's Protected Activity

During the period concerning the events at issue in this case, Arthur made several complaints about discrimination and retaliation at MSU. On July 23, 2018, she filed a charge with the EEOC complaining of age and sex discrimination in promotions. (ECF No. 95-6.) On September 11, 2018, she reported to MSU's Office of Institutional Equity (OIE) that she had been subjected to age and gender discrimination. (ECF No. 95-16 at PageID.732.) On October 5, 2018, she filed a charge with the EEOC complaining of retaliation by Bailey. (ECF No. 103-33.) On October 10, 2018, she reported to OIE that Bailey had retaliated against her in several ways. (ECF No. 103-32.) Finally, in June 2020, she filed a charge with the EEOC complaining of retaliation by Bailey. (ECF No. 105-3.)

## II.   Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.   Discussion

Retaliation claims under Title VII may be established through either direct or circumstantial evidence. *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). Arthur contends

that at least certain aspects of her claim are based on direct evidence. She cites Bailey's angry reaction and abrupt departure from the September 7, 2018 meeting; his request to other IPF employees to search for evidence of Arthur's improper conduct; his submission of negative materials to Folino to undermine her reclassification, particularly the document titled "Kim Notes;" and his July 8, 2020 email concerning Arthur's July 2020 EEOC charge. (ECF No. 92 at PageID.340.) Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Such "evidence proves the existence of a fact without any inferences or presumptions." *Norbuta v. Loctite Corp.*, No. 98-3013, 1999 WL 357780, at *1 (6th Cir. May 20, 1999) (per curiam).

The evidence Arthur cites does not meet these requirements. First, Bailey's angry reaction to Arthur's statement that he believed suggested an intent to include him in an OIE or other investigation is not direct evidence of retaliatory motive because it is not linked to any particular adverse action. *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (noting that "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by [unlawful retaliation]"); *Crane v. Monterey Mushroom, Inc.*, 910 F. Supp. 2d 1032, 1042–43 (E.D. Tenn. 2012) (president's comments indicating that he was angry and upset that the plaintiff had cancer and would have to take FMLA leave not direct evidence because "the factfinder would need to draw inferences and make assumptions in order to find that Shah's anger translated into a motivation to discriminate"). Second, Bailey's request to other IFP employees to review Arthur's prior transactions—spurred by a report of arguably improper conduct from two other IPF employees—does not directly prove the existence of retaliatory motive. The same is true of the materials that Bailey submitted, at

Folino's request, in connection with the reclassification. In fact, Bailey told Folino that he supported Arthur's request, albeit at a level 12. (ECF No 103-31.) Finally, Bailey's July 8, 2020 email also does not constitute direct evidence, as Bailey merely explained the background of Arthur's EEOC charge in the email and why it was not an adverse action. In fact, Bailey confirmed that in the face of Arthur's ongoing protected activity, he "continued to proceed with a 'business as usual' attitude." (ECF No. 103-40.) Nothing in this email constitutes direct evidence of retaliation. Thus, Arthur must prove her claim through circumstantial evidence.[4]

Circumstantial retaliation claims under Title VII are evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) the employer was aware of plaintiff's protected activity; (3) she suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the action. *Id.* If the defendant meets its burden, the plaintiff must then demonstrate that the proffered reason was pretextual. *Id.* This entails a showing that the defendant's proffered reason: (1) has no basis in fact, (2) did not actually motivate the adverse action, or (3) was insufficient to motivate the adverse action. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). If a plaintiff can show that the

---

[4] Whether this evidence amounts to direct evidence is immaterial in any event. *See Handshoe v. Mercy Med. Ctr.*, 34 F. App'x 441, 446 (6th Cir. 2002) ("Even where there is direct evidence of discriminatory comments or remarks, the plaintiff may not prevail unless she shows an actionable injury.") (citing *Antonucci v. Goodyear Tire & Rubber Co.*, No. 93–3135, 1994 WL 49569, at *3 (6th Cir. Feb.17, 1994)). As set forth below, the Court concludes that the retaliatory actions Arthur identifies as direct evidence of retaliation were not materially adverse action.

defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination. *Id.* "Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff at all times." *Id.*

Only the third and fourth elements are at issue in the present motions. The scope of adverse action in the retaliation context is not coextensive with actions affecting "the terms, conditions, or status of employment" pursuant to Title VII's substantive antidiscrimination provision. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61 (2006); *see also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008) (adverse actions in retaliation cases are not "limited to [the] narrow definition of an 'adverse employment action' that includes only actions affecting the terms, conditions or status of employment"). Instead, the antiretaliation provision extends to action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 77. However, such action still must be materially adverse, meaning that an individual is protected from "retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67. A materially adverse action does not include trivial harms, such as "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68. The Sixth Circuit has cautioned district courts against relying on its pre-2006 cases "[t]o the extent that the[y]... conflict with *Burlington Northern* as to what constitutes a materially adverse action for purposes of a Title VII retaliation claim." *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569 n.3 (6th Cir. 2019).

To establish the fourth element, a plaintiff must show that "'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quoting *University of Tex. Sw. Med. Ctr.*

*v. Nassar*, 570 U.S. 338, 360 (2013)). In other words, traditional principals of "but-for causation" apply. *Nassar*, 570 U.S. at 360.

Arthur alleges the following retaliatory actions: (1) reclassification to level 12; (2) shifting the Fiscal Officer title to Bailey; (3) negative assessment on IPF Leadership Assessment Development Tool (LAD Tool); (4) retirement cake counseling; (5) lack of support regarding overtime compensation; (6) reduced contact and avoidance; (7) exclusion from management meetings; (8) flyspecking, micromanaging, and tracking of Arthur's duties; (9) selective removal of duties; (10) conflict of interest rule violation; (11) Bailey's anger and negative comments; (12) Bailey's changed and negative impression of Arthur; (13) review of Arthur's transactions; (14) Bailey's submission of negative notes and materials; (15) Bailey's September 14, 2018 and July 8, 2020 emails; and (16) cumulative effect of actions.

## A.    Reclassification, Fiscal Officer Title, and Bailey's Notes

Arthur's central claim is that being reclassified to a level 12 position, rather than the level 13 position she sought, constituted retaliation.[5]  MSU contends that Arthur cannot prove causation to support this assertion. That is, MSU argues, the unrefuted evidence presented through the

---

[5] Although Arthur refers to Bailey's delay and lack of truthfulness regarding the submission of her reclassification request, she does not indicate that such action/inaction is a separate basis for her retaliation claim. In any event, the claim would fail on causation. It is undisputed that Bailey had done nothing to advance Arthur's reclassification request before the July 10 meeting and continued to do nothing with it thereafter. Bailey testified that after he received the materials that Arthur emailed him, he printed them off and looked at them in bits and pieces, but did not "give it the attention it needed in June and July." (ECF No. 103-12 at PageID.1023.) The same was true through August and September. Thus, whatever information Bailey learned at the July 10 meeting did not materially affect his handling of the reclassification. Bailey's explanation for not addressing the matter was that he was new in the position, had a lot of things going on, had never handled a reclassification, and lacked the time needed to address it. (*Id.*) Moreover, Bailey handled the two male supervisors' classification requests in a similar manner. After receiving the requests in early August, he did not submit them until October, opting first to inquire about the possibility of a merit increase in lieu of reclassification. (ECF No. 95-2 at PageID.641.)

14

Bailey, Jacobs, Pung, and Folino declarations show that Arthur's job duties did not warrant reclassification to a level 13. MSU further contends that even if Arthur could establish a prima facie case, the claim still fails because MSU's determination that Arthur's duties were more comparable to Feister's duties, even though Jacobs believed it was a close call, constitutes a legitimate, non-retaliatory reason for reclassifying Arthur to a level 12. (ECF No. 95 at PageID.620–23.) Arthur responds that a dispute of fact remains because the declarations MSU presents are "noncredible" and "not actual evidence" as they are at odds with Folino's contemporaneous emails and notes. Arthur contends that the contemporaneous evidence shows that Bailey's negative and retaliatory input, rather than anything Jacobs had to offer, drove Folino's final recommendation for a level 12 reclassification. (ECF No. 103 at PageID.103–837.)

Contrary to Arthur's contentions, the admissible and unrefuted evidence in the record shows that Bailey's input and comments did not drive the final classification decision. Folino essentially states that he does not have an independent recollection of Arthur's classification request, but he attaches his notes reflecting the process he followed. (ECF No. 95-5 at PageID.659.) Despite his lack of recall, Folino confirms that his standard practice was to recommend a range of classification levels but ultimately defer to the judgment of the HR professionals in the employee's unit to allow for consistent application in the unit. (*Id.* at PageID.660.) In line with this testimony, Jacobs, who handled the analysis for IPFHR, testified about her comparison of Arthur's duties to those of Andrews and Feister, her reasoning why Arthur's duties compared more favorably to Feister's duties at a level 12, but even then, was a close call, and her and McManus's level 12 recommendation to Folino during their December phone conversation. (ECF No. 95-2 at PageID.639–41.) As Jacobs sets forth, Arthur and Andrews did not hold comparable positions. Andrews was employed at the division level; Arthur was not. Andrews was responsible for an

entire division's operating budget; Arthur was not. Moreover, Arthur had only two direct reports, while Andrews had five direct reports. Arthur presents no contrary evidence suggesting that Andrews was a more appropriate comparator than Feister.

Arthur's claim that the contemporaneous record contradicts the proffered declarations is based primarily on Folino's November 30, 2018 email regarding the status of his review, in which he stated that he had spoken to Bailey, that Bailey said he was going to provide some materials and agreed with "the recommendation to reclassify [Arthur] to the" level 12 position, and that Folino would provide his final recommendation immediately after reviewing Bailey's documents. (ECF No. 103-31.) Notwithstanding this email, it is undisputed that Folino subsequently spoke with Jacobs and McManus and received their input. Folino's December 7, 2018 email to Richard Fanning and his notes summarizing the process confirm as much. (ECF No. 95-5 at PageID.662– 65; ECF No. 103-28 at PageID.1139.) Moreover, regardless of their admissibility, Jacobs's statements to the investigator reflected in the May 15, 2020 final OIE investigative report (ECF No. 103-42 at PageID.1208)—that Arthur says are contradictory—are fully consistent with Jacobs's testimony in her declaration.

In short, Arthur's arguments based on her interpretation of Folino's emails and notes are nothing more than speculation about Folino's final recommendation rather than admissible evidence. In this regard, the present circumstances are analogous to those in *Kubik v. Central Michigan University Board of Trustees*, 221 F. Supp. 3d 885 (E.D. Mich. 2016), *aff'd* 717 F. App'x 577 (6th Cir. 2017), in which the plaintiff claimed that retaliatory negative comments from her academic department led to the university's decision not to reappoint her. The court noted that the plaintiff failed to show that the provost's independent decision would not have occurred but for the department's negative recommendation. *Id.* at 912–13. The court noted that the provost had

previously warned the plaintiff that she needed to improve her scholarship to obtain reappointment and had his own independent review. While the present circumstances do not perfectly track those in *Kubik*, the evidence in the record similarly shows a valid, independent basis for Folino's final recommendation that Arthur has failed to rebut.

As to the change in Fiscal Officer designation, Arthur contends that it was adverse because the number of transactions she processed declined following the change in her status, which in turn directly impacted one of the criteria of the level 13 classification. (ECF No. 103 at PageID.838.) Yet, she presents no evidence showing that the change in title, as opposed to some other factor, affected the number of transactions she performed or that more transactions would have altered the final reclassification analysis. More importantly, Arthur cannot demonstrate causation, as it is undisputed that Pung initially suggested the change to Bailey and other department heads in IPF as a means of implementing best practices of financial accountability. Arthur admitted that Bailey had discussed the change with her before their July 10 meeting, but now asserts that Bailey had decided against the change as he did not implement it immediately. The evidence she cites—her own testimony—does not support her assertion that Bailey had decided against the change. (ECF No. 103-9 at PageID.889–90.) Bailey explained the basis for his decision to reassign the Fiscal Officer title in his September 14, 2018 email to McManus and his supervisor, Adam Lawver. (ECF No. 103-26.) In that communication, Bailey noted that he made the decision following a financial planning meeting with Support Services in which neither Arthur nor Steve Wallace was able to answer questions about LS's financial status. Arthur's characterization of Bailey's comments is inaccurate. He said that the situation was "extremely embarrassing," not that Arthur or her performance was an "embarrassment." Bailey recognized that Arthur was not tracking the accounts and that, as manager of LS, he rather than Arthur should

be familiar with, and accountable for, LS's accounts. Thus, assigning himself the Fiscal Officer title facilitated this change but did not materially change Arthur's existing duties. (*Id.* at PageID.1132–33.)

As for Bailey's notes and other materials that he submitted to Folino, even if providing those materials can be considered adverse, Arthur cannot demonstrate causation as she has presented no evidence that the notes had any bearing on the reclassification decision or affected her employment in any material way. The mere fact that Bailey provided the notes containing arguably negative comments does not mean that Folino considered them material to his recommendation. As already noted, the relevant comparators supported reclassification, at most, to level 12. In this regard, it is important to remember that the focus of the decision was the proper classification level of Arthur's position, not deficiencies in, or criticisms of, her past job performance, as would be the case in an annual review or a decision whether to grant a merit pay increase.

## B.    Negative Assessment on LAD Tool

Arthur fails to demonstrate that the scores Bailey assigned her on the LAD Tool amounted to a materially adverse action. The LAD Tool allows IPF employees to score themselves in key core competencies considered important to leadership roles in IPF. It also allows supervisors to score their employees to provide feedback that the employees may use if they wish to advance into leadership positions. In other words, the scores provide a roadmap for improving leadership skills. (ECF No. 95-3 at PageID.647.) Although any employee may voluntarily use the LAD Tool, those employees with existing supervisory responsibilities are required to use it and discuss their scores with their supervisors. The sole purpose of the LAD Tool is so help employees develop their skills.

In contrast to performance review documents, LAD Tool scores are not placed in an employees' personnel files and have no bearing on merit raises. (*Id.*)

Even if Bailey's scores for Arthur on the LAD Tool can be considered "negative," Arthur fails to show that she suffered an injury or harm from Bailey's scores because they did not impact her compensation or job status. *See Kyle-Eiland v. Neff*, 408 F. App'x 933, 941 (6th Cir. 2011) (noting that a negative performance evaluation is not materially adverse unless it "has an adverse impact on an employee's wages or salary" (internal quotation mark omitted)); *Cecil v. Louisville Water Co.*, 301 F. App'x 490, 501 (6th Cir. 2008) (concluding that the plaintiff's negative evaluation was not materially adverse because the plaintiff failed to show that it affected her salary or professional advancement); *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007) (remanding to district court in light of *Burlington Northern* for further discovery on whether low performance evaluation actually impacted the plaintiff's wages or promotion potential). In fact, one might argue that a supervisor's failure to share an honest assessment of an employee's deficiency in a particular skill could itself constitute adverse action because it would deprive the employee of the opportunity to improve and hone a skill needed to advance the employee's career.

### C.   Retirement Cake/Review of Transactions

Arthur likewise fails to show that the retirement cake issue amounts to retaliation. To begin, Arthur presents no evidence that Bailey's meeting with her about the cake was materially adverse, as she was not disciplined, was not asked to repay the amount for the cake, and suffered no discernable injury or harm in relation to her employment. *See Wood v. Mich. Dep't of Corrs.*, No. 20-10994, at *7–8 (E.D. Mich. Jan. 7, 2022) (investigations which cleared the plaintiff of wrongdoing and did not result in discipline did not amount to adverse employment actions); *Lyons*

*v. Donahoe*, No. 3:13-cv-120, 2015 WL 457855, at \*7 (S.D. Ohio Feb. 2, 2015) ("Even if the Court draws the interference in Lyons' favor that the discussion was unappreciated or unpleasant, no reasonable jury could conclude that this single instance of a supervisor expressing disapproval of two days' absence would dissuade a reasonable person from engaging in protected Title VII activity."). Although Arthur claims that Bailey mentioned discipline several times during the meeting, it is undisputed no discipline was ever imposed. Second, Arthur cannot establish causation, as two employees informed Bailey of the cake issue days after he and Arthur met on September 7, 2018. In other words, Bailey did not go looking for a reason to harangue Arthur.

Arthur's primary argument here is that Bailey's handling of the issue was retaliatory. Essentially, she contends that it was no big deal, but Bailey blew it out of proportion. (ECF No. 103 at PageID.841.) However, in public employment, optics matter. Even if a transaction is ultimately shown to be fair and legitimate, the appearance of impropriety alone can undermine trust in the institution. Here, Arthur was not simply seeking reimbursement for a cake that she had purchased for the retirement party at the local grocery store or bakery.[6] Instead, as she readily admits, she was transacting business with her employer by selling MSU a cake that she had made through her own business. Maybe she gave MSU a great deal on a premium cake, but she had not mentioned payment to Bailey, and he had every right as her supervisor to discuss the issue with her. As well, upon learning of the issue, Bailey had a legitimate, nonretaliatory reason to ask the proper employees to review Arthur's transactions to confirm for his own peace of mind that there were no other undisclosed transactions lying in the weeds. (ECF No. 103-26 at PageID.1134.) Thus, no reasonable jury could conclude that Bailey's handling of this issue was retaliatory.

---

[6] Arthur is correct that MSU has a policy permitting reimbursement of expenses for retirement parties, but nothing in that policy permits an employee to engage in self-dealing with the university. *See* https://ctlr.msu.edu/combp/mbp45ebs.aspx.

### D.     Overtime Compensation

Arthur contends that LS and MSU HR have retaliated against her by denying her overtime compensation after she was reclassified to level 12. MSU has demonstrated that retaliation had nothing to do with the denial of Arthur's overtime requests. Rather, the APSA Collective Bargaining Agreement (CBA) and related documents drove the issue. It is undisputed that the CBA provides for overtime payment only for classifications under 12. (ECF No. 95-3 at PageID.648; ECF No. 95-7 at PageID.678.) The 2018 version of the CBA contained a Letter of Agreement setting forth an exception for several specific positions, including Landscape Services Supervisors. That position included operational supervisors who were required to work overtime in connection with snow removal, football gameday cleanup, and similar events. (ECF No. 95-3 at PageID.648, 651–52.) The title Landscape Services Supervisor has been renamed as Landscape Service Coordinator. The Letter of Agreement for the current CBA adopted in 2019 was amended to align the currently-used job title with the Letter of Agreement's intent. (ECF No. 95-7 at PageID.679.) Because Arthur is not a Landscape Services Coordinator, she is not entitled to overtime compensation.

Citing a March 8, 2011 email from McManus regarding the issue, however, Arthur argues that MSU and McManus approved an exception for Adam Lawver but not for her, which shows retaliation. (ECF No. 103 at PageID.840.) But the email Arthur cites does not support her argument. Rather, it shows that Lawver was entitled to overtime compensation because he was a "Snow Supervisor for Landscape Services/works football clean-up/special events." (ECF No. 103-35 at PageID.1175.) Thus, he was entitled to overtime compensation per the parties' interpretation of the CBA and the Letter of Agreement. (*Id.*) Arthur does not perform such duties. Moreover,

having reviewed the issue on Arthur's behalf, APSA has elected not to grieve it. (ECF No. 95-14;
ECF No. 95-17 at PageID.794–95.)

      **E.**    **Bailey's Anger and Changed Impression, Reduced Contact, Flyspecking, Exclusion from Meetings, Conflict of Interest Form**

      Even under *Burlington Northern*'s more generous standard for adverse action in retaliation claims, Arthur has not established that these matters amount to materially adverse employment action. First, assuming that the evidence shows what Arthur says it does—that Bailey's impression or perception of her changed after the July 10 meeting—this is not action. Arthur's contention otherwise ignores the Supreme Court's longstanding recognition that Title VII is not "'a general civility code for the American workplace.'" *Burlington*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

      Second, Bailey's anger and comments during the September 7, 2018 meeting with Arthur do not meet the standard. "Consultation between a supervisor and an employee, even when it involves a 'confrontation . . . in which harsh words were exchanged,' is not a materially adverse action." *Siegner v. Township of Salem*, 654 F. App'x 223, 231 (6th Cir. 2016) (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007)). Bailey's tense exchange with Arthur was nothing more than the type of minor workplace annoyance that many, if not all, employees experience at some point. *Burlington*, 548 U.S. at 68.

      Third, Arthur's allegations of reduced contact, flyspecking, and exclusion from meetings are factually unsupported and/or simply not adverse action. As for flyspecking, Arthur provides conclusory assertions with no details showing how the alleged action materially interfered with her employment. (ECF No. 103 at PageID.832; ECF No. 103-8 at PageID.877.) Next, Arthur admits that she still attends bimonthly supervisor meetings and meets with Bailey one-on-one once a month. (ECF No. 103-10 at PageID.965–67.) Although she claims (without specific dates or

examples) that she was not involved in or informed of certain management meetings (ECF No. 103-8 at PageID.876), she fails to show how such exclusion caused her concrete injury or harm. *See Finley v. City of Trotwood*, 503 F. App'x 449, 454 (6th Cir. 2012) (exclusion from meetings not materially adverse action); *Cecil*, 301 F. App'x at 501 (exclusion from a meeting and plant tour and coworker's uncooperativeness amounted to "petty slights or minor annoyances).

Fourth, regarding avoidance and reduced contact, Arthur identified three instances in which LS supervisors went to IPFHR rather than to her with HR questions. (ECF No. 103-16 at PageID.1068–69.) She contends that they did so because Bailey's comment at a supervisor's meeting alerted them to her protected conduct. (ECF No. 109-1 at PageID.1335–37.) This allegation, however, does not hold up. According to Arthur, each of these instances occurred prior to August 30, 2018—the date of the supervisor's meeting at which Bailey told supervisors to go to IPFHR. (ECF No. 103-16 at PageID.1068–69; ECF No. 103-17.) Moreover, as Arthur's October 2018 email to a supervisor shows, it was not uncommon for LS supervisors to seek advice from IPFHR rather than Arthur. (ECF No. 109-6.) Thus, Arthur fails to demonstrate adverse action causally related to her protected conduct.

Finally, to the extent Arthur claims that McManus's email regarding her failure to submit a conflict-of-interest form is an adverse action, she fails to present any developed argument on the issue. In any event, it is undisputed that Arthur was not disciplined due to her failure to complete the form, and the issue arose almost two years after her protected conduct, negating any inference of retaliation.

## F.    Selective Removal of Duties

Arthur's selective removal of duties allegation is a bit puzzling because, as set forth above, Bailey greatly expanded Arthur's duties by assigning responsibility for all aspects of LS hiring to

Arthur and her staff and authorized an additional direct report to assist her with these duties. Arthur's claim here focuses on alleged reduction in her HR responsibilities. But as set forth above, she fails to demonstrate that Bailey did anything to curtail her informal HR role because of her protected conduct. In fact, the evidence shows the opposite. For example, in October 2018 Arthur told a supervisor that handling an HR issue was within her job description and she "normally handle[s] the small HR issues here in our office that we have clearly spelled out with policy." (ECF No. 109-6.) Earlier that month she told Folino that she acts as the HR representative for LS, "including discussing policy and procedures to employees multiple times a day." (ECF No. 103-30 at PageID.1158.) In November 2018, Bailey affirmed to Folino Arthur's statement that she was the contact for "employee concerns regarding processes, procedures, policies, complaints, union contract interpretation, personal issues, [and] counseling." (ECF No. 103-28 at PageID.1145.) Finally, Arthur's most recent job description states that addressing HR issues comprises 25% of her assigned duties. (ECF No. 109-7 at PageID.1386.)

G.      **Bailey's September 14, 2018 and July 8, 2020 Emails**

Arthur's contention that Bailey's emails amount to adverse action lacks merit. In his September 14, 2018 email to Lawver and McManus, Bailey simply reported on certain issues involving Arthur, including reassignment of the Fiscal Officer title, circumstances surrounding Arthur's reclassification request, and the cake issue. Bailey also indicated that he would have a list of questions for the "investigatory meeting soon," apparently referring to an OIE investigation. (ECF No. 103-26.) Arthur fails to show how this email translated into a materially adverse action. The same is true for Bailey's July 8, 2020 email, which merely responded to Arthur's latest EEOC charge complaining about the score Bailey gave her on her most recent LAD Tool assessment. Although Bailey was reluctant to share his feedback in writing, he had told Arthur that he would

24

be happy to provide it verbally upon request. (ECF No. 103-40.) Both emails were nothing more than workplace annoyances or petty slights that do not amount to adverse action.

### F.    Cumulative Effects

Finally, Arthur contends that the combined effect of Bailey's and others' actions, regardless of their materiality, amounts to adverse action. Arthur does not allege such a theory in her complaint. In any event, the sole Sixth Circuit case Arthur cites for this proposition is *Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014). Nothing in *Laster*, however, indicates that the court found the individual constituents of the collective adverse action to be immaterial. *See id.* at 732. The single case Arthur cites that provides some support, *Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997), is an out-of-circuit, pre-*Burlington* decision. As MSU correctly notes, the Sixth Circuit declined to follow *Kim* in *Handshoe v. Mercy Medical Center*, 34 F. App'x 441, 447 (6th Cir. 2002). Moreover, here there was no "papering" of Arthur's personnel file, as was the case in *Kim*. In fact, there is no evidence that Bailey reprimanded or disciplined Arthur at all. And as set forth above, the actions Arthur asserts were not materially adverse and/or not causally related to her protected activity. The only cumulative effect of these non-adverse actions is summary judgment. Accordingly, the Court rejects this argument.

### IV.   Conclusion

For the foregoing reasons, the Court will grant MSU's motion for summary judgment, deny Arthur's motion for partial summary judgment, and dismiss Arthur's third amended complaint with prejudice.

A separate order will enter.


Dated: May 23, 2022                                     /s/ Sally J. Berens
                                                       SALLY J. BERENS
                                                       U.S. Magistrate Judge